IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHNNY FORD, in his individual )
and representative capacities, LOUIS )
MAXWELL, in his individual and )
representative capacities, THEODORE )
SAMUEL, in his individual and )
representative capacities, DYANN )
ROBINSON, in her individual and )
representative capacities, BARBARA )
HOWARD, in her individual and )
representative capacities, and )
WILLIE PATTERSON, in his )
individual capacity, )
  )
     Plaintiffs, )
  )
     v. ) CASE NO. 2:13-CV-214-WKW
  ) [WO]
LUTHER STRANGE, )
individually and in his official )
capacity as Attorney General )
for the State of Alabama, and )
ROBERT BENTLEY, individually )
and in his official capacity, )
  )
     Defendants. )

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Plaintiff Johnny Ford is the Mayor of Tuskegee, Alabama, the county seat of

Macon County, and a former six-term member of the Alabama House of

Representatives.  During his tenure in the House, then-Representative Ford sponsored

a local constitutional amendment for the legalization of charitable bingo games in Macon County. That local constitutional amendment made it on the ballot in 2003, and in a referendum, a majority of the qualified voters in Macon County approved Amendment No. 744 to the Alabama Constitution. Mayor Ford and five additional African-American registered voters in Macon County bring this action against Alabama Attorney General Luther Strange and Governor Robert Bentley. Plaintiffs allege that after Defendants won elections in November 2010, they impermissibly took over the regulation of bingo in Macon County and effectively shut down the sole provider of electronic bingo games in Macon County. According to Plaintiffs, Defendants engaged in a series of unprecleared actions that resulted in the negation and dilution of their votes cast in the 2003 referendum, perpetuated the effects of past discrimination against African-Americans, and amounted to purposeful acts of racial discrimination in voting in violation of §§ 2 and 5 of the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution. Plaintiffs seek declaratory and injunctive relief, including an order enjoining Defendants from conducting further raids on bingo operations in Macon County.

On the surface, Plaintiffs say this case is about vindicating minority voting rights conferred by federal statutes and the United States Constitution. But just below that surface emerges a different purpose – saving electronic bingo operations at

2

Quincy's 777 Casino at VictoryLand ("VictoryLand"), a now-defunct Macon County gambling business.  Indeed, the Complaint references VictoryLand or VictoryLand's closing no less than forty times.

As a result of Amendment No. 744 and the sheriff's rules and regulations, VictoryLand opened an electronic bingo facility in Macon County in 2003, and operated successfully off and on until, as Plaintiffs complain, former Governor Bob Riley's Task Force on Illegal Gambling effectively closed VictoryLand's doors in 2010.  Plaintiffs allege that, when Governor Bob Riley left office, Governor Bentley and Attorney General Strange took over and continued the efforts to keep VictoryLand's doors closed and have succeeded to date.

Defendants have filed motions to dismiss, arguing that Plaintiffs lack standing or, alternatively, that the Complaint fails to state a claim upon which relief can be granted.  (Docs. # 22, 25, 26.)  The motions have been fully briefed.  After careful consideration of the arguments of counsel, the relevant law, and the allegations, the court finds that the motions are due to be granted.  Attorney General Strange also has filed a Motion for Sanctions pursuant to Federal Rule of Civil Procedure 11 (Doc. # 33), and Plaintiffs have responded in opposition (Doc. # 34).  The motion for Rule 11 sanctions is due to be granted pursuant to Rule 11(b)(2).

## II.  STANDARDS OF REVIEW

### A.    Rule 12(b)(1)

A plaintiff's standing implicates the court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  *See Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1227 n.14 (11th Cir. 2000) (noting that standing "raises an even more basic question of jurisdiction that cannot be waived and goes to the very heart of the 'case or controversy' requirement of Article III").  On a Rule 12(b)(1) facial attack, the court evaluates whether the complaint "sufficiently allege[s] a basis of subject matter jurisdiction," employing standards similar to those governing Rule 12(b)(6) review.  *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335–36 (11th Cir. 2013).

### B.    Rule 12(b)(6)

When evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court takes the complaint's allegations as true and "construe[s] them in the light most favorable to" the plaintiff.  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012).  To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[F]acial plausibility" exists "when

4

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id.*

In addition to considering the properly pleaded allegations of the complaint, on a motion to dismiss, the court can consider exhibits attached to the complaint. *See Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005).  The court also can consider "an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged."  *Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

## III.  BACKGROUND[1]

### A.   Amendment No. 744

Amendment No. 744 was sponsored by then-representative Ford, the lead Plaintiff in this action.  It provides, in part, that

> [t]he operation of bingo games for prizes or money by nonprofit organizations for charitable, educational, or other lawful purposes shall be legal in Macon County. The sheriff shall promulgate rules and regulations for the licensing and operation of bingo games within the county.   The sheriff shall insure compliance with such rules or regulations . . . .

---

[1] The facts are gleaned from the Complaint and the attached exhibits.  Because the court must accept the allegations of the complaint as true at this stage of the litigation, the facts set out in this opinion may not be the "actual facts."  *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 n.1 (11th Cir. 2006).

Ala. Const. 1901 amend. No. 744.

Alabama's Constitution is unique in that it allows a county to enact a constitutional amendment that applies only to that county. *See* Ala. Const. 1901 amend. No. 555. According to the Complaint, there are at least sixteen constitutional amendments authorizing some form of bingo in individual counties in Alabama. (Compl. ¶ 27.)

**B.    Electronic Bingo in Macon County (VictoryLand)**

Constitutional amendments notwithstanding, *electronic* bingo has a troubled past in Alabama, Macon County included.[2]   The sole offering of electronic bingo games in Macon County has been at VictoryLand, and the games began in December 2003.  (Compl. ¶ 45; *see also* Compl., Ex. 11 (attorney general's news release).) Under the sheriff's regulations, certain nonprofit organizations – including the Tuskegee Repertory Theater, Macon County Commission, and Macon County Board of Education – received licenses from the sheriff of Macon County to operate electronic bingo games at VictoryLand and contracted with VictoryLand to operate electronic bingo games on their behalf.  (Compl. ¶¶ 3–5, 42–44.)

---

[2] The word "electronic" does not appear in Amendment No. 744, but it later surfaced in the sheriff's rules and regulations.

In December 2004, the then-incumbent Alabama Attorney General Troy King issued a written finding that the electronic bingo games played at VictoryLand were lawful under Alabama law. (Compl. ¶ 46.) But the future of bingo at VictoryLand would not remain so rosy.

## C.     State-Sanctioned, Statewide Opposition to Electronic Bingo

### 1.     *Attorney General King and Governor Riley's Alliance*

In February 2006, some fourteen months after Attorney General King declared electronic bingo operations at VictoryLand lawful, he changed course. At a joint press conference, then-Attorney General King and then-Governor Riley revealed their plan to submit proposed legislation to the Alabama Legislature "to close existing loopholes in Alabama law which would 'end electronic bingo' and 'ban[ ] the use of electronic devices in playing bingo under existing local amendments, limiting the games that are authorized to traditional paper bingo.'" (Compl. ¶ 47.) But no such legislation was forthcoming from the Alabama Legislature for reasons not explained in the Complaint, and VictoryLand continued to operate without threat of governmental interference, that is, until 2008. (*See* Compl. ¶ 49.)

### 2.     *Governor Riley's 2008 Executive Order No. 44*

On December 29, 2008, Governor Riley signed an executive order that formed the Governor's Task Force on Illegal Gambling "for the purpose of promoting and

supporting uniform statewide enforcement of Alabama's anti-gambling laws and to carry out the Alabama Constitution's strong public policy against lottery schemes and illegal gambling." (Compl., Ex. 16 (Executive Order No. 44).)  For Governor Riley believed that there was "occurring at sites across this State, under the name of 'bingo,' gambling activity which no reasonable observer could assert in good faith to be 'the ordinary game of bingo,' particularly slot-machine style gambling . . . ." (Executive Order No. 44, at 2.)  He further believed that there was "an obvious lack of uniformity in the enforcement of these laws from county to county – a state of affairs . . . which [was] being exploited by gambling's promoters to expand and entrench illegal gambling activity in Alabama."[3] (Executive Order No. 44, at 2.)

Also, by Executive Order No. 44, Governor Riley appointed a special prosecutor to serve as the task force commander, giving the commander statewide jurisdiction to investigate and prosecute illegal gambling activity. (Executive Order No. 44, at 2.)  The task force moved into action, notwithstanding the objection of Attorney General King to Governor Riley's formation of the task force. (Compl. ¶¶ 53–54.)  Initially, the task force was unable to obtain a search warrant for VictoryLand because no state-court judge with jurisdiction in Macon County would

---

[3] Alabama prohibits casino-style gambling.  *See* Ala Const., art. IV, § 65 (prohibiting "lotteries or gift enterprises for any purposes"); Ala. Code § 13A-12-20 (defining, among other terms, "gambling device" and "slot machines"); Ala. Code § 13A-12-37 (criminalizing possession of a gambling device); *see generally Ex parte State*, 121 So. 3d 337 (Ala. 2013).

agree to sign a warrant.  So on January 29, 2010, at 4:00 a.m., and without a warrant, "hundreds of" officials from various state law enforcement agencies "swarmed" VictoryLand for the purpose of seizing the 6,000 electronic bingo machines on its premises.  (Compl. ¶¶ 64, 65.)  That raid was halted promptly by a state circuit court judge's temporary restraining order ("TRO"), but when the Alabama Supreme Court dissolved the TRO, VictoryLand found it best to cease operating electronic bingo, rather than face another raid.  (Compl. ¶¶ 68, 69.)  Thus, on August 9, 2010, VictoryLand closed its electronic bingo doors.

## D.     A New Attorney General (Strange) and a New Governor (Bentley)

In November 2010, seven years after the passage of Amendment No. 744, a new attorney general and a new governor for the State of Alabama were elected, Luther Strange and Robert Bentley, respectively.  (Compl. ¶ 73.)

### 1.     A Secret Meeting to Spawn Anti-Gambling Litigation

Plaintiffs allege that Attorney General Strange, before taking office, secretly met with then-Governor Riley, and the two agreed that if Governor Riley would transfer $7.9 million of BP Oil Spill recovery money to the Attorney General's Fund, Attorney General Strange would use the funds to fuel, so to speak, litigation related to illegal gambling cases.  (Compl. ¶ 75.)

9

**2.    *Governor Bentley's Executive Order No. 1***

On January 18, 2011, his first day in office, Governor Bentley signed Executive Order No. 1, which rescinded his predecessor's Executive Order No. 44 and effectively disbanded the statewide Task Force on Illegal Gambling. (Compl. ¶ 78, Ex. 18 (Executive Order No. 1).) Executive Order No. 1 provides in full:

> WHEREAS, the new Attorney General, Luther Strange, has stated that he intends to enforce the laws of the State of Alabama with respect to anti-gambling, lottery schemes and illegal gambling; and,

> WHEREAS, it appears that the Governor's Task Force on Illegal Gambling, established by Executive Order 44, dated December 30, 2008, as amended by Amendment Number 1, thereafter, is no longer necessary; and,

> WHEREAS, I, Robert Bentley, Governor of the State of Alabama, anticipate and expect that Luther Strange, Attorney General, will fully and completely enforce the laws of the State of Alabama with respect to anti-gambling, lottery schemes and illegal gambling;

> NOW THEREFORE, I, Robert Bentley, Governor of the State of Alabama, by virtue of the authority vested in me by the Constitution and laws of the State of Alabama, and for other good and valid reasons, which relate thereto, do hereby revoke, repeal and rescind Executive Order 44, dated December 30, 2008, as amended by Amendment Number 1, thereafter.

> BE IT FURTHER ORDERED that this Executive Order shall become effective immediately upon the Governor's signature and shall remain in effect until amended or modified by the Governor.

> DONE AND ORDERED,
> this the 18th day of January, 2011.
> Robert Bentley
> Governor

### 3. *Attorney General Strange's Memoranda*

Almost a month later, on February 17, 2011, Attorney General Strange entered into Memoranda of Understanding with certain electronic bingo machine vendors by which the vendors agreed to remove their electronic bingo machines from specified Alabama facilities, including VictoryLand.  (Compl. ¶ 79; *see also* Compl., Exs. 30, 31, 32.)  Three months later, on May 16, 2011, Attorney General Strange issued a "Memo to District Attorneys, Law Enforcement Set[ting] Forth [the] State's Legal Position Regarding Gambling."  (Compl., Ex. 36 (Attorney Gen.'s May 2011 Mem.).)  In that memorandum, Attorney General Strange set out his understanding that Executive Order No. 1 "returned to the Attorney General's Office the primary authority for ensuring that Alabama's gambling laws are enforced statewide."  (Attorney Gen.'s May 2011 Mem., at 1.)  The memorandum also set forth the State of Alabama's position on "gambling devices."   It emphasized the Alabama Constitution's "strict prohibition against gambling," pronounced that "[s]lot machines and other gambling devices are illegal in all 67 counties," and established that "gambling devices used in counties with bingo amendments must play traditional bingo as defined by the Alabama Supreme Court . . . ."  (Attorney Gen.'s May 2011 Mem., at 1.)

11

### 4. *Attorney General's Execution of a Search Warrant at a Greene County Electronic Bingo Facility*

After establishing the State's position on enforcement of Alabama's anti-gambling laws, Attorney General Strange executed a search warrant at Greenetrack, an electronic bingo facility in Greene County, on June 1, 2011.[4]  (Compl. ¶ 91.)  No search warrant was sought against VictoryLand's electronic bingo facility at that time because it remained closed.

### E.   Mayor Ford's Support for VictoryLand

VictoryLand's owner was contemplating reopening its doors, and Mayor Ford supported that endeavor.  To that end, Mayor Ford signed a resolution for the City of Tuskegee on November 13, 2012, pronouncing that the City of Tuskegee "stands with VictoryLand, its management, employees and former employees as they attempt to return to successful business activity."  (Compl., Ex. 2.)  In that resolution, the City of Tuskegee also resolved that it would "strongly oppose and take legal action available when appropriate if deemed by the Council, against any person, entity or agency that threatens legal [action], whether civil or criminal, against

---

[4] A Jefferson County Circuit Judge "specially appointed by the Alabama Supreme Court" signed the warrant.  (Compl. ¶ 91 & Ex. 38.)  However, on August 3, 2011, that judge found that the State had provided false information in support of the warrant application and that probable cause for the warrant was lacking.  (Compl. ¶ 94.)  Consequently, the state circuit judge set aside the search warrant and ordered the return of the property (presumably the electronic bingo machines) seized during execution of the warrant.  (Compl., Ex. 40.)

VictoryLand. . . ." (Compl. Ex. 2.)  Mayor Ford signed a similar resolution on behalf of the Utilities Board of the City of Tuskegee, whose customer, VictoryLand, used "more electricity than any other customer."  (Compl., Ex. 1.)

## F.    VictoryLand's Grand Reopening

During the time frame of Mayor Ford's public support, VictoryLand representatives met with Attorney General Strange to discuss his May 2011 Memorandum and its potential application to VictoryLand.  (Compl. ¶ 97.)  As a result of that meeting, Attorney General Strange opined in a letter to VictoryLand's legal counsel that if VictoryLand reopened with electronic bingo machines like those at facilities such as Greenetrack in Greene County, then he would declare those machines illegal.  (Attorney Gen.'s Oct. 19, 2012 Letter 1 (Compl., Ex. 41).) VictoryLand also applied for a liquor license, which it obtained over strenuous objection from Attorney General Strange.  (Compl. ¶¶ 98, 103–06.)

Finally, on December 18, 2012, VictoryLand reopened with electronic bingo offerings, which the sheriff of Macon County publicly declared complied with Amendment No. 744 and his regulations and were not "slot machines or illegal gambling devices."  (Compl. ¶ 102.)  But Attorney General Strange disagreed; he opined that the machines were illegal under Alabama law.

13

**G.**   **Attorney General Strange's Quest for a Search Warrant for VictoryLand**

Attorney General Strange set course to obtain a warrant to search VictoryLand, but met a roadblock on January 16, 2013, when a Macon County circuit judge refused to sign the search warrant.  (Compl. ¶¶ 108–09.)  The next day, on January 17, Attorney General Strange filed a petition for writ of mandamus to the Alabama Court of Criminal Appeals seeking a writ directing the Macon County circuit judge to sign the warrant.  (Compl. ¶ 110.)  The Alabama Court of Criminal Appeals denied the petition, but undeterred, Attorney General Strange filed the petition with the Alabama Supreme Court, which granted it.  (Compl. ¶¶ 113, 114, 119); *see generally Ex parte State*, 121 So. 3d 337, 350 (Ala. 2013) (opinion granting petition for writ of mandamus and holding that the Macon County circuit judge "acted outside the discretion afforded him by law when he denied the State's request for a search warrant").  Hence, with a writ in hand, Attorney General Strange received a search warrant from the Macon County circuit judge on February 19, 2013.  (Compl. ¶ 121.)

**H.**   **The Execution of the Search Warrant and VictoryLand's Shutdown**

On February 19, 2013, agents acting under Attorney General Strange's directives finally executed the search warrant at VictoryLand and seized 1,600 electronic bingo machines and more than $220,000 in cash.  (Compl. ¶ 122.)  From that day forward, VictoryLand has been closed.

14

I.     **This Lawsuit**

Mayor Ford and his five co-Plaintiffs have filed this lawsuit against Attorney General Strange and Governor Bentley.  Three of the six Plaintiffs are leaders of nonprofit organizations in Macon County that have received licenses to operate electronic bingo at the now-defunct VictoryLand.  These Plaintiffs are Louis Maxwell, chairman of the Macon County Commission; Theodore Samuel, president of the Macon County Board of Education; and Dyann Robinson, director of the Tuskegee Repertory Theatre.  Plaintiff Barbara Howard is the president of the National Association for the Advancement of Colored People ("NAACP"), Tuskegee-Macon County Branch, and Plaintiff Willie Patterson is a former VictoryLand employee. Five of the six Plaintiffs – Mayor Ford, Mr. Maxwell, Mr. Samuel, Ms. Robinson, and Ms. Howard – are registered voters in Macon County and voted in favor of the 2003 referendum on Amendment No. 744.  The sixth Plaintiff – Mr. Patterson – has been a registered voter in Macon County since 2007 and worked at VictoryLand prior to its closure.

The Complaint alleges that Defendants' "discriminatory actions" have "devastate[d] Tuskegee, Macon County and its citizens.  By the closing of VictoryLand, a historically poverty stricken area of black citizens will remain so[,] and public services that VictoryLand's operating revenue would have funded will be

15

curtailed or eliminated altogether." (Compl. ¶ 151.) Mayor Ford, joined by his five co-Plaintiffs, contends this case is not about VictoryLand's closing or the legality of VictoryLand's electronic bingo machines, but rather that this is a case of federal statutory and constitutional magnitude with respect to a deprivation of voting rights. That contention is spurious.

In their Complaint, Plaintiffs primarily attack five actions of Defendants as violating the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution: (1) Governor Bentley's Executive Order No. 1 that effectively disbanded his predecessor's statewide Task Force on Illegal Gambling; (2) Attorney General Strange's February 17, 2011 Memoranda of Understanding requiring vendors to remove their electronic bingo machines from specified facilities, including VictoryLand; (3) Attorney General Strange's May 2011 Memorandum setting forth the State of Alabama's legal position on gambling; (4) Attorney General Strange's actions taken to obtain a search warrant in early 2013, including his petition requesting the Alabama Supreme Court to issue a writ of mandamus directing a named circuit court judge to sign a warrant authorizing the search of VictoryLand and the seizure of its electronic bingo machines; and (5) Attorney General Strange's execution of that search warrant at VictoryLand and

the concomitant seizure of 1,600 electronic bingo machines and more than $220,000 in cash.

The Complaint alleges that the "actions" of Defendants (presumably the actions described in the preceding paragraph) constituted changes with respect to voting. Those changes allegedly required preclearance under Section 5 (Count 1), nullified Plaintiffs' vote in favor of Amendment No. 744 in violation of Section 2 (Count 2), purposefully discriminated against Plaintiffs by nullifying and diluting their vote in favor of Amendment No. 744 in violation of Section 2, and the Thirteenth, Fourteenth, and Fifteenth Amendments (Count 3), and were fundamentally unfair in violation of the Fourteenth Amendment's Due Process Clause (Count 4). But tellingly absent are any allegations of actions bearing a direct relation to voting.

Plaintiffs request a "three-judge court to hear and decide Count One" of their Complaint. (Compl. 32.) On Counts 2, 3, and 4, Plaintiffs request a declaratory judgment, an injunction "enjoin[ing] Defendants from implementing Defendant Strange's memorandum and from conducting further police raids on bingo operations in Macon County," costs, and attorney's fees. (Compl., at 33 (prayer for relief).)

In a prior Order, the court denied the request for a three-judge court on the § 5 claim and found based upon the decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), that Count 1 was "'wholly insubstantial' and 'completely without merit.'"

17

(Order 2 (Doc. # 35) (quoting *United States v. Saint Landry Parish Sch. Bd.*, 601 F.2d 859, 863 (5th Cir. 1979)).)  This lawsuit proceeds, therefore, on Counts 2, 3, and 4 of the Complaint.

## IV.  DISCUSSION

Defendants move to dismiss Counts 2, 3, and 4 for lack of Article III standing or, alternatively, for failure to state a claim upon which relief can be granted.[5]  Part A addresses whether Plaintiffs have Article III standing, and Parts B, C, and D address whether the Complaint states plausible claims in Counts 2, 3, and 4.  Part E includes an alternative finding with respect to Count 1.  Part F addresses Attorney General Strange's motion for Rule 11 sanctions.

## A.    <u>Article III Standing</u>

Defendants contend that Plaintiffs lack Article III constitutional standing to bring this suit.   Article III, § 2, of the United States Constitution "limits the jurisdiction of federal courts to Cases and Controversies, which restricts the authority of federal courts to resolving the legal rights of litigants in actual controversies." *Genesis Healthcare Corp. v. Symczyk*, ⸺ U.S. ⸺, ⸺, 133 S. Ct. 1523, 1528 (2013) (citations and internal quotation marks omitted).

---

[5] Defendants have filed separate motions to dismiss the Complaint, but each has adopted and incorporated the arguments made by the other.  (*See* Doc. # 25.)  Thus, unless otherwise indicated, the court addresses Defendants' arguments collectively.

The test for evaluating constitutional standing has three elements. First, the plaintiff must have suffered an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation and internal quotation marks omitted). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." (internal citations and quotation marks omitted). "Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant . . . .'" *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* (quoting *Simon*, 426 U.S. at 38). The burden is on the party invoking federal jurisdiction to demonstrate each element of constitutional standing. *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000). The first inquiry is whether there is an injury in fact.

In *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295 (11th Cir. 2006), the Eleventh Circuit succinctly summarized what it takes to demonstrate an injury in fact:

> "[T]o establish an injury in fact, [a plaintiff] must first demonstrate that the [defendant] has invaded some 'legally protected interest' of his." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 980–81 (11th Cir. 2005). A "legally cognizable injury" requires infringement of "an interest . . .

19

Case 2:13-cv-00214-WKW-WC   Document 46   Filed 12/23/13   Page 20 of 54

protected by statute or otherwise." *Id.* (internal quotation marks omitted) (quoting *Cox Cable Commc'ns, Inc. v. United States*, 992 F.2d 1178, 1182 (11th Cir.1993)). That "interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right." *Id.*

*Id.* at 1304.

Plaintiffs claim to have an injury protected by federal statutory and constitutional laws protecting minority voting rights. In sum, to use Plaintiffs' words, at the "heart" of their Complaint "is the nullification of their voting rights."[6] (Pls.' Resp. to Mot. Dismiss, at 4 (Doc. # 30).) Generally speaking, in voting rights cases, "[w]here a plaintiff's voting rights are curtailed, the injury is sufficiently concrete to count as an 'injury in fact.'" *Judge v. Quinn*, 612 F.3d 537, 545 (7th Cir. 2010) (citing *Dep't of Commerce v. U.S. House of Reps.*, 525 U.S. 316, 331–32 (1999)).

Defendants contend, however, that although Plaintiffs pretend this suit is about voting infringement, it really is about "law enforcement actions taken with respect to the VictoryLand casino in Macon County" when on February 19, 2013, law enforcement agents seized VictoryLand's 1,600 electronic bingo machines, thus, forcing VictoryLand's closure. (Strange's Mot. Dismiss, at 17 (Doc. # 23).)

---

[6] In Counts 2 and 3, Plaintiffs bring claims for violations of § 2 of the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution. These claims rest on alleged impairments of voting rights. In Count 4, Plaintiffs contend that the purported fundamental unfairness of Defendants' actions derives from Defendants' alleged disregard for the voters who "overwhelmingly adopted" Amendment No. 744, which legalized charitable bingo in Macon County and appointed the Macon County sheriff to promulgate rules and regulations for its governance. (Compl. ¶¶ 153, 154.) This claim also rests on an alleged trampling of voting rights.

20

According to Defendants, Plaintiffs "have not been injured by Defendants' enforcement of generally applicable gambling laws because those laws have not been enforced against them," but rather against Victoryland. (Strange's Mot. Dismiss, at 19 (emphasis omitted).) Defendants are correct that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Sec. of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 955 (1984) (citation and internal quotation marks omitted). However, Plaintiffs disavow that this is the sort of injury they are asserting. Rather, Plaintiffs define their injuries as follows. With respect to all but Plaintiff Patterson, Plaintiffs argue that not only did they vote in favor of Amendment No. 744 in 2003, but that – individually and as representatives of nonprofit organizations licensed to conduct electronic bingo at VictoryLand – they "have been deprived of their right to operate electronic bingo games" and "have lost and continue to lose the revenues generated by electronic bingo games in Macon County." (Pls.' Resp. to Mot. Dismiss, at 8.) As to Plaintiff Patterson, Plaintiffs argue that he "lost his job at VictoryLand and continues to lose wages as a result of the loss of his job." (Pls.' Resp. to Mot. Dismiss, at 8.) Based on the foregoing, Plaintiffs categorize their injuries as the inability to conduct electronic bingo at VictoryLand (five out of six Plaintiffs) and as

a loss of a job opportunity (sixth Plaintiff).  For the reasons to follow, Plaintiffs fail

to allege an injury in fact sufficient to confer Article III constitutional standing.[7]

The Complaint is replete with allegations focused on Plaintiffs' inability to

conduct or play electronic bingo games at VictoryLand (or, as is the case with one

Plaintiff, to work at VictoryLand) and the concomitant economic losses.   But

Plaintiffs do not cite any authority to support their position that an inability to operate

electronic bingo or work at an electronic bingo casino is based on an interest that the

federal voting rights laws protect.  The connection between Defendants' actions

culminating in the execution of a search warrant at VictoryLand in 2013 (that led to

its closure) and an injury to Plaintiffs' voting rights almost ten years earlier in 2003

simply is too tenuous.[8]  The allegations establish that in 2003 four of the five Plaintiffs

voted with the majority of Macon County voters in favor of Amendment No. 744[9];

those votes were sufficient to pass Amendment No. 744; and those votes were given

full effect in that Amendment No. 744 became the law in Macon County.  There are

---

[7] Because Article III constitutional standing is lacking, the court need not address Defendants' arguments with respect to prudential standing.

[8] The connection is so vaporous that it brings to mind Judge Kallon's lament in *Set Free Community Development Corp. v. Bentley*, No. 11cv1802, at 45 n.7 (N.D. Ala. Sept. 23, 2011) (opinion granting defense motions to dismiss):  "The court bristles at the implied comparison between the constitutional rights pursued valiantly during the civil rights movement – rights fundamental to equality and liberty – and Set Free's right to continue operating electronic bingo gaming.  Such a comparison is inappropriate, misplaced, and an affront to the brave women and men who risked their lives and in some cases lost their lives to obtain the basic rights guaranteed to them by the Constitution and other federal laws."  (Doc. # 23-2, Ex. B.)

[9] The fifth Plaintiff, Patterson, did not vote in the 2003 referendum.  (*See* Compl. ¶ 7.)

no allegations demonstrating, however, that the effectiveness of Plaintiffs' votes was diminished at all then and certainly not a decade later based upon actions resulting in the execution of a search warrant at VictoryLand. Plaintiffs' injuries – loss of revenue and income due to their inability to operate electronic bingo or work at VictoryLand after its closure – bear no resemblance to the type of injuries alleged by plaintiffs in voting rights cases where standing has been found to exist. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 207–08 (1962) (recognizing resident voters' standing to challenge a state districting plan that violates the one-person, one-vote standard). Plaintiffs'

alleged injuries are not based upon voting rights[10] and, thus, do not demonstrate Article III standing.

It should be noted that the Complaint also hints at another purported injury, although Plaintiffs make no mention of it in their brief.  In the Complaint, Plaintiffs lament that the effectiveness of the votes they cast in 2003 in favor of Amendment No. 744 suffered because beginning in 2010, Defendants refused to honor the rules pertaining to electronic bingo that the Macon County sheriff promulgated pursuant to

---

[10] Indeed, as Defendants contend, this case seems to have little to do with a voting rights injury and rather everything to do with Defendants' actions that led to the closure of VictoryLand, which Plaintiffs contend contravened Amendment No. 744.  (*See, e.g.*, Compl. ¶¶ 30–45, 63, 88, 90, 132, 133.)  It appears that what the Complaint really is made up of are claims that Defendants violated state constitutional law.

The disguising of state-law claims as federal-law claims would raise a *Pennhurst* problem, however.  In *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984), the Supreme Court held that the Eleventh Amendment deprives federal courts of jurisdiction to order a state official to comply with state law.  *See id.* at 121.  While the Complaint stops short of expressly requesting an injunction that Defendants act in conformity with Amendment No. 744 (as Plaintiffs interpret Amendment No. 744), the requested relief would appear to achieve that aim.  Namely, if, as Plaintiffs request, Defendants are enjoined from implementing statewide policies that interpret Alabama's anti-gambling laws as prohibiting the type of electronic bingo machines that patrons played at VictoryLand prior to its 2013 closure, and if Defendants are enjoined "from conducting further police raids on bingo operations in Macon County" (Compl., at 33 (prayers for relief)), then undoubtedly electronic bingo games could resume at VictoryLand without interference from Defendants, given the sheriff's prior approval of such games.  This in effect would mean that Amendment No. 744 would function exactly how Plaintiffs think it should, that is, consistent with the Macon County sheriff's previous proclamation that "electronic bingo machines in operation at VictoryLand compl[y] with [Amendment No. 744] and the Sheriff's Regulations and are not slot machines or illegal gambling devices."  (Compl. ¶ 102.)

In short, Plaintiffs' requested relief would require state officials to conform with Amendment No. 744 as Plaintiffs interpret it.  Accordingly, under the rationale of *Pennhurst*, the Eleventh Amendment would preclude the relief requested.  Governor Bentley focuses on this *Pennhurst* problem in his opposition to Plaintiffs' pending motion to amend the Complaint, which is addressed in a separate Memorandum Opinion and Order entered this date.  The same argument is appropriate with respect to the original Complaint as well.

his authority under Amendment No. 744.  Allegations suggesting Defendants' alleged disregard of the sheriff's rules abound.  (*See, e.g.*, Compl. ¶¶ 30, 38, 40, 41, 88, 153, 159, 160.)  But standing cannot rest on that footing either.

"The Supreme Court has repeatedly made clear that an injury to the 'right possessed by every citizen, to require that the government be administered according to law' is insufficient to support a claim of standing." *Chiles v. Thornburgh*, 865 F.2d 1197, 1205–06 (11th Cir. 1989) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 493 (1982)).  In *Chiles*, the Eleventh Circuit held that a U.S. senator did not have standing to challenge executive non-enforcement of a law:  "Senator Chiles is basically arguing that as a Senator he has a right to see that the laws, which he voted for, are complied with.  Such a claim of injury . . . is nothing more than a 'generalized grievance [ ] about the conduct of the government.'"  *Id.* at 1205 (quoting *Flast v. Cohen*, 392 U.S. 83, 106 (1968)).

Similarly, in *Lance v. Hoffman*, 549 U.S. 437 (2007), the Court held that Colorado voters did not have standing to challenge a judicially created redistricting plan that they asserted violated the Elections Clause.  "The only injury plaintiffs allege is that the law – specifically the Elections Clause – has not been followed.  This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past."  *Id.* at 442.  And the

25

Supreme Court reached the same conclusion in *Fairchild v. Hughes*, 258 U.S. 126 (1992), an action challenging the ratification of the Nineteenth Amendment as procedurally flawed.  The Court held that the plaintiff lacked Article III standing because he asserted "only the right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted." *Id.* at 129.  "Obviously this general right does not entitle a private citizen to institute [a suit] in the federal courts." *Id.* at 129–30.

The foregoing principles reveal the flaw in any alleged injury that hinges on the failure of Defendants to follow the bingo laws as Plaintiffs interpret them.  Those laws are Amendment No. 744 and the Macon County sheriff's rules and regulations governing bingo operations in Macon County.  Plaintiffs contend that Governor Bentley and Attorney General Strange misconstrue or, rather, ignore Amendment No. 744 by questioning the legality of the electronic bingo machines once in play at VictoryLand.  Even if it is assumed that Governor Bentley and Attorney General Strange are dead wrong as to their interpretation of the laws, Plaintiffs' right is the same right that all Macon County voters have – the right to require that government officials properly administer the law.  "This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court] ha[s] refused to countenance in the past." *Lance*, 549 U.S. at 442.

26

This right, for sure, does not permit Plaintiffs to bring a federal lawsuit to prevent Defendants from implementing Executive Order No. 1 or Attorney General Strange's May 2011 Memorandum (reflecting the state attorney general's reading of Alabama's anti-gambling laws), or "from conducting further police raids on bingo operations in Macon County." (Compl., at 33 (prayers for relief).)   Because Plaintiffs do not assert a concrete or particularized right, they lack an injury in fact and, necessarily, standing to bring their voting rights claims.  With no injury, it is unnecessary to address the causation and redressability prongs of Article III standing.

Even if Plaintiffs could establish standing, however, their claims fail on Rule 12(b)(6) review.  The court turns to an examination of the Complaint's claims in light of the parties' arguments for and against Rule 12(b)(6) dismissal.

## B.   Section 2 Results Claim (Count 2)

Section 2 of the Voting Rights Act bans "all States and their political subdivisions from maintaining any voting 'standard, practice, or procedure' that 'results in a denial or abridgement of the right . . . to vote on account of race or color.'"  *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 479 (1997) (quoting 42 U.S.C. § 1973(a) (emphasis omitted)).  Section 2 "does not deal with every voting standard, practice, or procedure, but rather is limited to voting procedures that deny someone the right to vote."  *Dougherty Cnty., Ga., Bd. of Ed. v. White*, 439 U.S. 32,

50 n.4 (1978). To prevail, a plaintiff must demonstrate that "based on the totality of the circumstances, . . . the political processes leading to . . . election . . . are not equally open to participation by [minority groups] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

Count 2 alleges that Defendants' "actions complained of herein" are "standards, practices, and procedures that have resulted in the denial and negation of [Plaintiffs'] right to vote . . . ." (Compl. ¶ 144.) Governor Bentley argues that the Complaint contains only two paragraphs with "specific charges of conduct" against him and that those two paragraphs deal with Executive Order No. 1. (Bentley's Mot. Dismiss, at 19 (Doc. # 26).) He says that Executive Order No. 1 has no "direct relation to voting" and, thus, the § 2 claim fails to state a claim upon which relief can be granted. (Bentley's Mot. Dismiss, at 19–20.) Attorney General Strange likewise argues that his actions pertaining to his enforcement of Alabama's gambling laws have no "direct relationship to voting." (Strange's Mot. Dismiss, at 23.) Both Defendants analyze Plaintiffs' claims under §§ 2 and 5, asserting that the "same arguments that doom Plaintiffs' § 5 claim doom their § 2 claim." (Strange's Mot. Dismiss, at 29.)

In their response to the motion to dismiss, Plaintiffs do not mention § 2, but rather focus only on § 5. Plaintiffs argue that Governor Bentley's Executive Order

28

No. 1 amounts to a "change[ ] affecting voting" that requires preclearance under § 5. (Pls.' Resp. to Mot. Dismiss, at 11.)  They describe Executive Order No. 1 as an order appointing Attorney General Strange as the "new anti-gambling czar," and argue that this order is a standard, practice, or procedure with respect to voting under § 5.  (Pls.' Resp. to Mot. Dismiss, at 11–13.)  Additionally, Plaintiffs do not discuss any action by Attorney General Strange in their § 5 analysis, but in an earlier section of their brief titled "Bingo in Macon County," Plaintiffs mention that when Attorney General Strange "decided what bingo must be and issued his May 2011 memorandum, he usurped the authority which had been vested solely in the Macon County Sheriff." (Pls.' Resp. to Mot. Dismiss, at 5.)  Even though Plaintiffs give short shrift to any meaningful analysis regarding the May 2011 Memorandum and do not respond to Defendants' § 2 arguments in their response to the motions to dismiss, the court nevertheless will address Executive Order No. 1 and the May 2011 Memorandum in the context of § 2, given the overlapping statutory language in § 2 and § 5.

The § 2 issues are whether either Executive Order No. 1 or the May 2011 Memorandum is a standard, practice, or procedure that has a direct relation to voting. Defendants principally rely upon *Presley v. Etowah County Commission*, 502 U.S. 491 (1992), to argue that neither comes close to giving rise to a § 2 claim.  Their arguments are sound.

*Presley* addressed the scope of § 5 of the Voting Rights Act, but its analysis applies to § 2 because *Presley* defined terms that are embodied in both § 2 and § 5: "voting qualification or prerequisite to voting, or standard, practice, or procedure" with respect to voting.  *Compare* 42 U.S.C. § 1973(a), *with* 42 U.S.C. § 1973c; *see Morse v. Republican Party of Va.*, 517 U.S. 186, 209 (1996) (Stevens, J.) ("[C]hanges in practices within covered jurisdictions that would be potentially objectionable under § 2 are also covered under § 5."); *Holder v. Hall*, 512 U.S. 874, 882 (1994) (Kennedy, J.) ("[T]he coverage of §§ 2 and 5 is presumed to be the same."); *Bonilla v. City Council of City of Chi.*, 809 F. Supp. 590, 596 n.3 (N.D. Ill. 1992) (noting that "[a]lthough *Presley* technically dealt with the scope of § 5 . . . , it is equally applicable to § 2 because *Presley* defined the key terms in both sections").

In *Presley*, the Supreme Court held that § 5 applies only to a change in a "standard practice or procedure" that has a "direct relation to, or impact on, voting." 502 U.S. at 506.  The Court observed that it had recognized four types of changes that meet the "direct relation" test:  Those that (1) "involved the manner of voting"; (2) "involve[d] candidacy requirements and qualifications"; (3) "concerned changes in the composition of the electorate that may vote for candidates for a given office" or (4) "affect[ed] the creation or abolition of an elective office."  *Id.* at 502–03.  "The first three categories involve changes in election procedures, while all the examples

30

within the fourth category might be termed substantive changes as to which offices are elective." *Id.* at 503. *Presley* distinguished between changes in a standard, practice, or procedure directly affecting voting by the electorate and "changes in the routine organization and functioning of government." *Id.* at 504. While the latter changes may indirectly affect voting, they are not within the scope of § 5.

The *Presley* plaintiffs argued that a transfer of duties among and away from elected officials pertaining to repairs and discretionary spending for road maintenance within two Alabama county commissions constituted "changes" that had a direct relation to voting and, thus, required preclearance. *See id.* at 493. The first alleged change took away the commissioners' discretion to allocate funds as needed in their districts and instead put all funds in a common account to be doled out based upon needs of the county as a whole. The second alleged change, which occurred within another county commission, transferred authority concerning road and bridge operations from the elected county commissioners to an appointed county engineer who answered to the commission. *See id.* at 497–99.

The Supreme Court held that these changes did not fit within any of the four categories it had previously recognized as having a direct relation to voting. *See id.* at 503–08. The first alleged § 5 change "concern[ed] the internal operations of an elected body." *Id.* at 503. "Changes which affect only the distribution of power

among officials are not subject to § 5 because such changes have no direct relation to, or impact on, voting." *Id.* at 506.  The other alleged § 5 change also did not require preclearance because even if "the delegation of authority to an appointed official is similar to the replacement of an elected official with an appointed one" (fourth category), it did not "change[ ] an elective office to an appointive one." *Id.* at 506–07. Both before and after the change, the county voters could elect their county commissioners.  And while the change resulted in a shift in the balance of authority through the creation of an appointed post, the commission "retain[ed] substantial authority, including the power to appoint the county engineer and to set his or her budget." *Id.* at 508.  The Supreme Court concluded:

> Covered changes must bear a direct relation to voting itself.  That direct relation is absent in both cases now before us.  The changes in [the two county commissions] affected only the allocation of power among governmental officials.  They had no impact on the substantive question whether a particular office would be elective or the procedural question how an election would be conducted.  Neither change involves a new "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting."  42 U.S.C. § 1973c.

*Id.* at 510.

Plaintiffs do not contend that either Executive Order No. 1 or the May 2011 Memorandum falls within the first three categories enumerated in *Presley*, and appropriately so.  The May 2011 Memorandum and Executive Order No. 1 do not have any "connection to voting procedures." *Id.* at 503.  They do not "affect the

32

manner of holding elections"; they "alter[ ] or impose[ ] no candidacy qualifications or requirements"; and they "leave[ ] undisturbed the composition of the electorate." *Id.* Plaintiffs nonetheless insist that Executive Order No. 1 and presumably the May 2011 Memorandum fit within *Presley*'s fourth category based upon a question the Supreme Court left unanswered in *Presley*, namely, "whether an otherwise uncovered enactment . . . might under some circumstances rise to the level of a *de facto* replacement of an elective office with an appointive one." *Id.* at 508.

### 1. *Executive Order No. 1*

Plaintiffs argue that Executive Order No. 1 appointed Attorney General Strange, who also is an elected official, to replace the Macon County sheriff as the regulatory authority over bingo operations in Macon County.  In Plaintiffs' words, Executive Order No. 1 "diminish[ed] the authority of the official whom the electorate of Macon County voted for by *de facto* replacing the elected office they solely entrusted with the promulgation and regulation of bingo rules by constitutional amendment with an appointed office." (Pls.' Resp. to Mot. Dismiss, at 12.)  But trying to force Executive Order No. 1 into *Presley*'s fourth category is "like a mean stepsister trying to push her big foot into one of Cinderella's tiny glass slippers." *Dewitt v. Proctor Hosp.*, 517 F.3d 944, 948 (7th Cir. 2008).  Executive Order No. 1 simply does not fit within the confines of a change that has a direct relation to voting.  There is nothing in the

33

Complaint suggesting that there has been a replacement, *de facto* or otherwise, of the Macon County sheriff, and there are at least three reasons why.

First, the fallacy of Plaintiffs' oversized argument is revealed through the text of Executive Order No. 1.  That Order declares Governor Bentley's intent to "enforce the laws of the State of Alabama with respect to anti-gambling, lottery schemes[,] and illegal gambling" and the Governor's expectation that Attorney General Strange "will fully and completely enforce" those laws.  (Executive Order No. 1, at 1.)  Based on those declarations, Executive Order No. 1 "revoke[s], repeal[s] and rescind[s] Executive Order 44" through which former Governor Riley created his Task Force on Illegal Gambling.

Executive Order No. 1 is notable for what it does not do.  It does not abolish the office of the sheriff of Macon County, replace the sheriff of Macon County with someone appointed to do his job, divest the Macon County sheriff of his authority to promulgate rules and regulations governing bingo in Macon County, or otherwise diminish any of the Macon County sheriff's powers.  In fact, Executive Order No. 1 does not mention or allude to the Macon County sheriff or any other Alabama sheriff.  Executive Order No. 1 also does not single out Macon County (or even mention that county or any other county); the order has statewide effect.  And the words "replace," "appoint," and "veto" do not appear anywhere in the Order.  There is nothing in the

34

language of the Order to support Plaintiffs' imaginative but legally unimaginable interpretation of Executive Order No. 1.

Second, Plaintiffs' position presumes that Attorney General Strange has no authority to enforce the State's anti-gambling laws in Macon County. That assumption is absurd. For nearly a century, the state attorney general has had authority to initiate prosecutions and criminal investigations on a statewide basis. *See* Ala. Code § 36-15-14 (1915) (providing that "[t]he Attorney General, either in person or by one of his or her assistants, at any time he or she deems proper, either before or after indictment, may superintend and direct the prosecution of any criminal case in any of the courts of this state"). Additionally, this year, the Alabama Supreme Court criticized the position of a Macon County circuit judge who essentially proclaimed, as Plaintiffs do in this case, that the Macon County sheriff is the "sole decision-maker as to whether the electronic gambling machines in the [VictoryLand] casino constitute the game of bingo." *Ex parte State*, 121 So. 3d at 355. Although the ultimate issue in *Ex parte State* is different from the issue in this case, the Alabama Supreme Court's reasoning aptly applies:

> [The Macon County sheriff's] opinion is, according to [the Macon County circuit judge], binding not only on that trial judge, but also on all other law-enforcement officers, even those who are above [the Macon County] . . . within the hierarchy of the executive branch of government. Such a position is contrary to a proper understanding of the separation of powers between the executive branch and the judicial branch, *see* Ala.

> Const. 1901, § 43, and to the provisions governing the power of the
> office of Attorney General.

*Id.*; *see also id.* at 356 (observing that the Macon County circuit judge "is legally
incorrect in stating that the local constitutional amendment 'allows the Sheriff to
determine the nature of bingo.' Regardless of what role might or might not be
prescribed for the sheriff in regard to such matters as deciding licensing requirements,
. . . the question of what the constitution means by the term "bingo" is a purely legal
question that must be decided by the courts.").  Plaintiffs fails to explain how a
controversy between the state attorney general and a county sheriff as to how the
interplay among Amendment No. 744, Article IV (§ 65) of the Alabama Constitution,
and the Alabama Code affects the legality of electronic bingo games at VictoryLand
amounts to the state attorney general's *de facto* replacement of the Macon County
sheriff.

Third, even if it could be said that Executive Order No. 1 altered the relative
power between the state attorney general and the Macon County sheriff concerning
the regulation of bingo in Macon County, there are no factual allegations to back up
the legal conclusion that the transfer of power amounts to a "*de facto* replacement of
the elected Sheriff of Macon County with Attorney General Strange." (Compl. ¶ 137);
*see Iqbal*, 556 U.S. at 678 (On Rule 12(b)(6) review, "the tenet that a court must
accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions."); *Randall v. Scott*, 610 F.3d 701, 709–10 (11th Cir. 2010) ("[L]egal conclusions must be supported by factual allegations.").   There are no factual allegations, for example, that Executive Order No. 1 resulted in a substantive change as to how the Macon County sheriff is put into office:   Both before and after Executive Order No. 1, the sheriff holds an elective office.   There also are no factual allegations suggesting that after Governor Bentley issued Executive Order No. 1, the citizens of Macon County were unable to vote for the sheriff of Macon County.  *Cf. Presley*, 502 U.S. at 503 (The creation of the commission's common fund "ha[d] no bearing on the substance of voting power, for it does not increase or diminish the number of officials for whom the electorate may vote.").

Nor do the allegations plausibly suggest that the sheriff of Macon County lost "substantial authority" as a result of Executive Order No. 1.  *Id.* at 508.  *Presley* did not define "substantial authority," nor has the Court since.   However, in *Presley*, because the commission retained its "substantial authority," there was not a *de facto* replacement of an elected office with an appointed one.  *See id.* (noting that the "Russell County Commission retains substantial authority, including the power to appoint the county engineer and to set his or her budget").

Plaintiffs allege that Executive Order No. 1 is a usurpation of the sheriff's enforcement authority related to the bingo rules and regulations in Macon County, but,

37

even if true, that authority is but one of the sheriff's duties.  Section 36-22-3 of the Alabama Code enumerates myriad duties of the sheriff.  Those duties include executing and returning the process of the Alabama courts "with due diligence," "attend[ing] upon" the state courts in his county, "obey[ing] the lawful orders and directions" of those courts, "ferret[ing] out crime, . . . apprehend[ing] and arrest[ing] criminals, and . . . secur[ing] evidence of crime."  Ala. Code § 36-22-3.  This statutory section alone reveals that the Macon County sheriff's duties are more expansive than merely regulating bingo in his county.   Even if it is assumed that the sheriff of Macon County lost his ability to regulate bingo as provided in Amendment No. 744, there are no allegations that any of his other duties were affected nor have Plaintiffs shown that those duties are insubstantial.  Extending § 2 to cover Executive Order No. 1 would "work an unconstrained expansion" of the Voting Rights Act.  *Presley*, 502 U.S. at 504.

### 2.   *May 2011 Memorandum*

Although Plaintiffs' brief in response to the motions to dismiss devotes scant attention to the May 2011 Memorandum, it is unquestionably clear that this memorandum does not "rise to the level of a *de facto* replacement of an elective office with an appointive one."  *Presley*, 502 U.S. at 508.  The May 2011 Memorandum merely confirms what Executive Order No. 1 pronounced – that Attorney General

Strange would enforce Alabama's laws with respect to illegal gambling – and sets out the state attorney general's position as to what type of bingo is and is not prohibited by the State's laws.  (Attorney Gen.'s May 2011 Mem., at 1)  For certain, the Macon County sheriff disagrees with Attorney General Strange's position on how Alabama's anti-gambling laws apply to VictoryLand's electronic bingo operations; however, for the same reasons discussed with respect to Executive Order No. 1, the May 2011 Memorandum falls far short of satisfying the hypothesized scenario in *Presley* where an appointed official effectively replaces an elected one.  In short, the May 2011 Memorandum has no "direct relation to, or impact on, voting" for the same reasons that the Executive Order No. 1 does not.[11]  *Presley*, 502 U.S. at 506.

C.   **Intentional Discrimination: § 2, Thirteenth, Fourteenth & Fifteenth Amendments (Count 3)**

In Count 3, Plaintiffs allege that Defendants engaged in intentional discrimination on the basis of race when they committed "[t]he actions . . . complained of herein" and that these actions "have abridged and negated the 2003 vote enacting

---

[11] It also would require a tortured reading of § 2 to find that any other act alleged in the Complaint – to include Attorney General Strange's February 17, 2011 Memoranda of Understanding requiring vendors to remove their electronic bingo machines from specified facilities (including VictoryLand), Attorney General Strange's actions taken to obtain a search warrant in early 2013 (including his petition for a writ of mandamus filed in the Alabama Supreme Court), and Attorney General Strange's execution of a search warrant at VictoryLand – is a change in a "standard practice or procedure" that has a "direct relation to, or impact on, voting."  *Presley*, 502 U.S. at 506.

Amendment 744" in violation of § 2 of the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments. (Compl. ¶¶ 149, 151.) It is notable that in their response, Plaintiffs make no arguments to preserve these claims of intentional discrimination. In any event, those claims have no shelf life.

There is a single glaring reason that Count 3 fails. Count 3 focuses on intentional racial discrimination affecting Plaintiffs' *right to vote*. Plaintiffs' assertions in their brief are consistent with the allegations. Namely, Plaintiffs assert that at the "heart" of their Complaint "is the nullification of their voting rights." (Pls.' Resp. to Mot. Dismiss, at 4 ("The plaintiffs have suffered and continue to suffer an irreparable injury because their right to vote guaranteed by the 15th Amendment has been violated in that the defendants have nullified and disregarded their lawful votes cast[ ] in 2003.").)

As found in Part V.B. above, none of Defendants' "actions" about which Plaintiffs complain has to do with voting or an election. The complained-of actions may reveal Plaintiffs' staunch policy disagreement with how Defendants are interpreting and enforcing Alabama's anti-gambling laws, in particular, against VictoryLand, but that is all. Plaintiffs have not demonstrated how they can show intentional discrimination on the basis of race with respect to *voting* when they have not alleged any facts that plausibly suggest that Defendants have affected their voting

40

rights.  Because in Count 3 Plaintiffs seek protection of their voting rights from intentionally discriminatory acts, those claims fail because any possible existence of discriminatory intent is not directed toward their voting rights, not even remotely. "The Voting Rights Act is not an all-purpose antidiscrimination statute." *Presley*, 502 U.S. at 509.  Because there are no allegations of intentional discrimination on the basis of race with respect to *voting*, Count 3 fails to state a claim upon which relief can be granted.[12]

**D.     Due Process Clause v. Equal Protection Clause (Count 4)**

Count 4 is titled, "Fundamental Unfairness, § 1983." (Compl., at 30.)  It alleges that Defendants' actions – conducting a raid of VictoryLand, seizing its electronic bingo machines, and invalidating the charities' bingo licenses – "ignored the rules and regulations adopted by the Sheriff" pursuant to Amendment No. 744, were "fundamentally unfair," and violated Plaintiffs' "due process rights."  (Compl. ¶¶ 159–60, 162.)  That is what is alleged in the Complaint, but in their response to the motions to dismiss, Plaintiffs describe the claim differently.  Instead of addressing a fundamental unfairness claim under the Due Process Clause, Plaintiffs allege that they have a valid equal protection claim because Defendants "have enforced the gambling

---

[12] An additional reason exists for dismissal of the Thirteenth Amendment claim in Count 3; it is, at best, redundant of the voting protections the Fourteenth Amendment and Fifteenth Amendment provide.  *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1188 n.9 (11th Cir. 1999) (noting that the Thirteenth Amendment "afford[s] no greater protection for voting rights claims than that already provided by the Fourteenth and Fifteenth Amendments").

41

laws in an uneven-handed manner" against Plaintiffs' "interest."  (Pls.' Resp. to Mot. Dismiss, at 9.)  Plaintiffs' argument is a mystery because the Complaint does not contain an equal protection claim nor do the words "equal protection" even appear in the Complaint.  The equal protection claim cannot survive Rule 12(b)(6) scrutiny, nor can the due process claim to the extent that Plaintiffs have not abandoned it.

### 1. *Due Process Claim*

It appears that Plaintiffs have abandoned any claim in Count 4 predicated on due process protection against fundamental unfairness.  But assuming that they have not, Plaintiffs cite no law in support of a due process claim based upon fundamental unfairness, and they only vaguely allege its factual contours.  Nonetheless, no matter how the claim is deciphered, no plausible substantive due process theory emerges from the Complaint for at least two reasons.

First, the Eleventh Circuit has held that where "the election process itself reached the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under [42 U.S.C.] § 1983 therefore in order."  *Roe v. Alabama*, 43 F.3d 574, 580 (11th Cir. 1995).  To the extent that Plaintiffs rely on this theory, *Roe* provides no refuge.  None of the actions about which Plaintiffs complain touches on an election process in even the slightest manner.

Second, to the extent that Plaintiffs' due process claim focuses on Defendants' alleged invalidation of the nonprofit organizations' electronic bingo licenses (Compl. ¶ 162), Plaintiffs fail to explain how they have standing to challenge an alleged invalidation of such a license. *Cf. CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1276 (11th Cir. 2006) (concluding that an organization lacked standing to challenge a provision where it "failed to present evidence that it has, or imminently will be, denied a permit"). Even if it is assumed that the three Plaintiffs who are at the helm of the licensed charities have standing, substantive due process only protects against deprivations of fundamental rights so "implicit in the concept of ordered liberty" that "no amount of process can justify [their] infringement." *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994). Whatever indirect rights Plaintiffs may have in licenses to operate electronic bingo at VictoryLand, they cite no authority establishing that those rights are fundamental, and the court is aware of none. *Cf. Nat'l Paint & Coatings Ass'n v. City of Chi.*, 45 F.3d 1124, 1129 (7th Cir. 1995) ("[L]icenses to do business . . . are . . . not 'fundamental rights.'"). Because Count 4 fails to allege a fundamental right, it does not plead a due process claim upon which relief can be granted. Count 4 is due to be dismissed.

43

### 2.   *Equal Protection Claim*

The equal protection claim lacks plausibility for at least two reasons.  First, plain and simple, the Complaint does not contain an equal protection claim.  The claim first surfaced in Plaintiffs' brief opposing the motions to dismiss; however, a plaintiff cannot amend a complaint in a brief responding to a motion to dismiss.  *See Jallali v. Nova Se. Univ., Inc.*, 486 F. App'x 765, 767 (11th Cir. 2012) (citing *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007)).  And it would be impermissible for the court to construe the Complaint as containing an equal protection claim.  *See generally Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 555, 559 (11th Cir. 2013) (explaining that it "goes without saying that the court is barred from amending a plaintiff's claim"); *GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998) ("[T]he district court went beyond the permissible boundaries of Fed. R. Civ. P. 8, in effect supplying GJR with an equal protection claim when none was evident on the face of the complaint."), *overruled on other grounds as recognized in Randall*, 610 F.3d at 709.

Second, Plaintiffs' premise for the equal protection claim is implausible.  The precise contours of this claim are not clear (as those contours are not alleged), but as stated, Plaintiffs assert in their brief that Defendants "have enforced the gambling laws in an uneven-handed manner against the plaintiffs' interests."  (Pls.' Resp. to Mot.

Dismiss, at 9.)   It may be then that Plaintiffs are attempting to assert a selective enforcement claim based upon a "class of one" theory.

A "class of one" equal protection claim does not entail a fundamental right or a suspect classification, but alleges that the plaintiff "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Because "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause," a plaintiff in an "unequally administered" claim must show a similarly situated comparator. *E & T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987); *see also Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007) ("The reason that there is a similarly situated requirement in the first place is that at their heart, equal protection claims, even class of one claims, are basically claims of discrimination." (citation and internal quotation marks omitted)).   A similarly situated comparator is one who is "*prima facie* identical in all relevant respects." *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1314 (11th Cir. 2006). Attorney General Strange contends that the similarly situated element is where the Complaint fails.[13]   (Strange's Mot. Dismiss, at 33–34.)

---

[13] Attorney General Strange alludes to the potential of a selective enforcement claim in Count 3.  Plaintiffs say that this is their claim in Count 4.

45

In their brief, Plaintiffs mention, without any analysis, that the "Indian-operated casinos are still functioning and the casino in Macon County . . . remains shut down after the most recent raid under the [state] Attorney General's direction." (Pls.' Resp. to Mot. Dismiss, at 10.)  It may be that Plaintiffs endeavor to compare themselves to an Indian-operated electronic bingo facility.  This comparison is not in the Complaint, but even if it were, the comparison is inadequate as a matter of law.  Plaintiffs include a mayor, three leaders of Macon County nonprofit organizations, the president of the NAACP (Tuskegee-Macon County Branch), and a former VictoryLand employee.  No Plaintiff is an electronic bingo facility, which is where it would seem the comparison to an Indian-operated casino would begin, given that the similarly situated element demands a high correlation of similarity between the comparators.  *Cf. Crystal Dunes Owners Ass'n Inc. v. City of Destin, Fla.*, 476 F. App'x 180, 185 (11th Cir. 2012) (holding that beachfront condominium owners were not similarly situated to non-beachfront landowners for purposes of the city's enforcement of trespass laws).  Plaintiffs make no attempt to explain and there are no factual allegations in the Complaint demonstrating how any one of them is "*prima facie* identical in all relevant respects" to an Indian-operated casino that is conducting electronic bingo operations in Alabama.  *Campbell*, 434 F.3d at 1314.

At best, three Plaintiffs are leaders of Macon County charitable organizations that have received licenses to operate electronic bingo at VictoryLand.  But these Plaintiffs neither allege nor argue that there are other similarly licensed charities which Defendants have permitted to conduct electronic bingo games at an Alabama casino pursuant to a local constitutional amendment allegedly authorizing such games. *Cf. Hope for Families & Comm. Serv., Inc. v. Warren*, 721 F. Supp. 2d 1079, 1162–64 (M.D. Ala. 2010) (analyzing whether *nonprofit organizations* which had contracted with Lucky Palace to conduct electronic bingo at an unbuilt facility in Macon County, but were denied licenses by the sheriff, were similarly situated to *nonprofit organizations* which had contracted with VictoryLand and were awarded licences by the sheriff).

Moreover, as to other Alabama counties where local constitutional amendments control the operation of charitable bingo gaming, the exhibits attached to Plaintiffs' Complaint suggest that Attorney General Strange has treated other casinos equally, not differently, in the enforcement of Alabama's anti-gambling laws.  (*See, e.g.*, Compl., Exs. 30, 31, 32 (agreements between the state attorney general and specified electronic bingo machine operators concerning the removal of electronic bingo machines from facilities in Macon County, Lowndes County, and Houston County and noting that the electronic bingo machines seized in Greene County were subject

to civil forfeiture proceedings); *see also* Compl. ¶¶ 91–94 (outlining Attorney General Strange's "raid[ ]" of Greenetrack in Greene County pursuant to a search warrant that later was judicially set aside).)

Plaintiffs fail to demonstrate an equal protection claim because they do not allege any facts showing a single similarly situated comparator who was treated differently. Accordingly, Rule 12(b)(6) requires the dismissal of any equal protection claim that can be extracted from the Complaint.

## E.   Section 5 (Count 1)

Although Count 1 of the Complaint has been dismissed, an additional observation about the § 5 claim is merited. In Count 1, Plaintiffs allege that Defendants violated § 5 by "implementing unprecleared policies and practices" that effectively overrode Amendment No. 744 and nullified Plaintiffs' "lawful[ ] votes cast in the 2003 referendum on Amendment 744." (Compl. ¶¶ 127, 129–42.) These alleged unprecleared policies and practices are the same "actions . . . complained of" with respect to Count 2. (*Compare* Compl. ¶¶ 131, 138, 140, 141 (Count 1) with Compl. ¶ 144 (Count 2).)

In a prior Order, the court denied Plaintiffs' request for a three-judge court on Count 1 and dismissed Count 1 with prejudice on the basis of the holding in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013). (*See* Order 2 (Doc. # 35)); *see Shelby*

*Cnty.*, 133 S. Ct. at 2631 (holding that the coverage formula in § 4(b) "can no longer be used as a basis for subjecting jurisdictions to preclearance" under § 5).[14] Defendants argue that even assuming *arguendo* § 5's viability, Count 1 was doomed from its inception based upon the principles pronounced in *Presley* because there is no direct relation between the complained-of changes and voting. *See Presley*, 502 U.S. at 506. Defendants' arguments repeat the arguments addressed in Part B with respect to Count 2. The analysis in Part B applies equally here. Because neither Executive Order No. 1 nor the May 2011 Memorandum is a "standard, practice, or procedure" that affects voting within the meaning of § 5, the § 5 claim would fail on precisely the same grounds that the § 2 claim fails.

## F.   **Attorney General Strange's Motion for Sanctions**

Attorney General Strange moves for sanctions against Plaintiffs' counsel, Donald LaRoche,[15] pursuant to Rule 11(b)(2), arguing that the claims in the Complaint are not "warranted by existing law or by a nonfrivolous argument for extending modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P.

---

[14] The decision in *Shelby County* "in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2." 133 S. Ct. at 2631.

[15] Mr. LaRoche, as counsel for Plaintiffs, filed and signed the Complaint in March 2013. (Doc. # 1, at 33.) Five months later, in September 2013, additional counsel for Plaintiffs filed a Notice of Appearance. (Doc. # 36.) Attorney General Strange filed his Motion for Sanctions in June 2013 and prior to the appearance of additional counsel for Plaintiffs; he seeks sanctions only against Mr. LaRoche.

49

11(b)(2); *see also* Fed. R. Civ. P. 11(c)(5)(A) (providing that Rule 11(b)(2) sanctions are available only against counsel and not against represented parties).

Sanctions are warranted under Rule 11(b)(2) because the Complaint is based on legal theories "that ha[ve] no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law." *Anderson v. Smithfield Foods, Inc.*, 353 F.3d 912, 915 (11th Cir. 2003). In deciding whether to impose Rule 11 sanctions, the district court should evaluate "whether the party's claims are objectively frivolous – in view of the facts or law – and then, if they are, whether the person who signed the pleadings should have been aware that they were frivolous; that is, whether he would have been aware had he made a reasonable inquiry. *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996).

The first issue is whether the claims in the Complaint are objectively frivolous. Part IV.A of this opinion provides an examination of Plaintiffs' Article III standing, and Part IV.B–E carefully examine each claim under Rule 12(b)(6). For the reasons explained, Plaintiffs clearly lack Article III standing, and each claim is legally unsound and untenable. The claims are objectively frivolous. Moreover, based upon the circumstances of this case, Mr. LaRoche should have known that the Complaint's claims were frivolous because a "reasonable inquiry" into the controlling law would have revealed this. *Worldwide Primates, Inc.*, 87 F.3d at 1254. Mr. LaRoche's

50

response to the Motion for Sanctions presents no convincing reason why Mr. LaRoche should not be sanctioned under Rule 11(b)(2).  His arguments, at best, mimic those he made in opposition to the pending motions to dismiss, and this Memorandum Opinion expressly rejects those arguments.

The next issue concerns fashioning an appropriate sanction for the Rule 11(b)(2) violation.  "The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant or part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."  Fed. R. Civ. P. 11(c)(4).  Although the sanction may take varied forms, it "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  *Id.*

Attorney General Strange contends that the sanctions should include "costs and reasonable attorney's fees for the time the State devoted to the motion to dismiss and this motion for sanctions."  (Doc. # 33, at 16.)  The court finds that this requested sanction is sufficient to satisfy Rule 11(c)(4)'s requirement limiting sanctions to what is sufficient to deter repetition of the offending conduct and comparable conduct by others similarly situated.  Attorney General Strange will be given an opportunity to provide records documenting his reasonable attorney fees and other expenses.[16]

---

[16] The Motion for Sanctions is denied insofar as it is based on Rule 11(b)(1).

## VI.  CONCLUSION

"[T]he right of suffrage is a fundamental matter in a free and democratic society[,]" and, thus, "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."  *City of Mobile v. Bolden*, 446 U.S. 55, 115 (1980) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964)).  But no scrutiny is warranted here because the Complaint, despite its labels, has nothing to do with the infringement of voting rights, and it fails under both Rule 12(b)(1) and Rule 12(b)(6) review.   Instead, the Complaint attempts to revive a private business offering electronic bingo that has been deemed illegal by the highest court in Alabama, the highest law enforcement official in Alabama, and the chief executive officer of Alabama, its Governor.

As to Rule 12(b)(1), the Complaint does not allege an injury in fact sufficient to confer Article III constitutional standing to bring a voting rights claim.  Plaintiffs' inability to participate in and profit from electronic bingo gambling at VictoryLand, which closed in 2013 allegedly as a result of Defendants' actions, is not an injury to a voting interest with respect to ballots cast in 2003 in favor of Amendment No. 744.  Moreover, any purported injury based upon Defendants' alleged wrongful interpretation of Alabama's anti-gambling laws is nothing more than a generalized grievance against the government's administration of the laws that is insufficient to confer standing.

Each of the five counts also fails under Rule 12(b)(6) review. The actions about which Plaintiffs complain – Governor Bentley's Executive Order No. 1 disbanding former Governor Riley's Task Force on Illegal Gambling, Attorney General Strange's February 17, 2011 Memoranda of Understanding requiring vendors to remove their electronic bingo machines from specified facilities (including VictoryLand), Attorney General Strange's May 2011 Memorandum espousing the state attorney general's intent to enforce Alabama's laws with respect to illegal gambling, Attorney General Strange's actions taken to obtain a search warrant in early 2013 (including his petition for a writ of mandamus filed in the Alabama Supreme Court), and Attorney General Strange's execution of a search warrant at VictoryLand – are not changes in procedure that have any direct relation to or impact on voting so as to give rise to either a § 2 claim or a § 5 claim (Count 2).

The Complaint also does not allege intentional discrimination on the basis of race with respect to voting because no facts plausibly suggest that Defendants have affected Plaintiffs' voting rights. Thus, the claims brought in Count 3 pursuant to the Thirteenth, Fourteenth, and Fifteenth Amendments also fail to state a claim upon which relief can be granted.

Count 4 alleges no facts that touch on an election process or an election process that is fundamentally unfair so as to state a substantive due process claim under the Fourteenth Amendment. Additionally, the allegations wholly are lacking with respect

53

to any Fourteenth Amendment equal protection claim, which Plaintiffs argue only in their briefing.   Moreover, the § 5 claim fails based upon the Supreme Court's recent decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), as set out in a prior Order, and for the same reasons that the § 2 claim fails.   Finally, because the Complaint is objectively frivolous and Plaintiffs' counsel, Mr. LaRoche, should have been aware of the Complaint's frivolousness, sanctions are warranted pursuant to Rule 11(b)(2).

Accordingly, it is ORDERED that Defendants' motions to dismiss (Docs. # 22, 25, 26) are GRANTED on grounds that Plaintiffs lack standing or, alternatively, that the Complaint fails to state a claim upon which relief can be granted.   It is further ORDERED that Defendant Attorney General Strange's Motion for Sanctions (Doc. # 33) is GRANTED pursuant to Federal Rule of Civil Procedure 11(b)(2).   Defendant Attorney General Strange is DIRECTED to submit an application for reasonable attorney's fees and other expenses associated with filing his motion dismiss and motion for sanctions, on or before **January 31, 2014**.   Jurisdiction is RETAINED for purposes of assessing Rule 11(b)(2) sanctions against Mr. LaRoche.

DONE this 23rd day of December, 2013.

　　　　　　　　　　 /s/   W. Keith Watkins
　　　　　　　　CHIEF UNITED STATES DISTRICT JUDGE